[Crim. No. 6841. Second Dist., Div. Two. Mar. 16, 1960.]

THE PEOPLE, Respondent, v. LAWRENCE GEORGE SCHMIDT, Appellant.

Harry Vincent Leppek for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David Cadwell, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant was convicted of violating Penal Code, section 337a, subdivision 6 (accepting a bet). His motion for a new trial was denied. He has appealed from the judgment of conviction and from the order denying his motion.

On November 11, 1958, Officer Bovensiep, of the Los Angeles Police Department, received from Sergeant Cohen a telephone number, address, and apartment number, together with information that bookmaking was being carried on at said address. Officers Bovensiep and Riegel were instructed to check on the activities that were being conducted at such location. The address was 2016 Meridian Avenue, South Pasadena. They took along with them two officers from that city. Upon reaching the location, Bovensiep went to a telephone in one of the apartments on the lower floor. Riegel went to Apartment I, on the second floor, where bookmaking was assertedly being carried on, checked the door, came back down the stairs and stood outside the window of the apartment from which Officer Bovensiep was beginning to make a telephone call to the number that Sergeant Cohen had given him. The officers had agreed that if bets were accepted, Bovensiep would wave his hand, and if not, he would shake his head. A male voice answered Bovensiep's call. Bovensiep said: "Larry, this is Charlie. Am I too late for the fourth?" The male voice replied, "No, you've got plenty of time." Bovensiep then said: "In the 4th at Tanforan 'My Bond' 5 across; in the 5th 'Broker's Reward,' 2 across." Bovensiep waved his hand, whereupon Riegel started toward the entrance to Apartment I in response to that signal. Bovensiep continued:

"In the 6th . . ." At this point the male voice interrupted the officer and said: "Slow up, you're going— slow up, I can't write that fast." The officer then repeated: "in the 6th, Tonco T-o-n-c-o, 5 across." The male voice then asked, "Who is this?" Bovensiep replied, "Charlie." At that instant Officer Bovensiep heard a loud noise and the phone was hung up. "My Bond," "Broker's Reward," and "Tonco" were the names of horses that were scheduled to run at Tanforan on that afternoon, November 11th.

Riegel went up the stairs, pulled on the door and forced it open. When he entered the apartment defendant was standing next to the kitchen sink. The tap water was flowing, and the garbage disposal was running. After the telephone went dead, Bovensiep left the apartment and proceeded to Apartment I. As he entered he observed defendant, Riegel, and two officers from South Pasadena. There was only one door through which one could enter or leave the apartment. Riegel observed no one come down the steps from defendant's apartment from the time Bovensiep was talking on the telephone. Bovensiep searched the apartment and found the racing section of a daily newspaper under the cushion of the davenport in defendant's living room. He also found a racing parlay manual in a dresser drawer in defendant's bedroom. The officer checked the telephone number in the apartment and found that it was the same number that he had called. At approximately 2:05 the telephone rang. Officer Bovensiep answered it. A female voice asked for Larry. The officer replied, "Larry had to go out." The phone was hung up. Some 10 minutes later a male voice asked for Larry. Bovensiep again replied that he had to go out and that he was handling the action. The male voice replied, "I had better call back when Larry is there," and hung up. At approximately 3 o'clock Riegel answered the phone and a female voice identified herself as Winnie, and asked whether he was making any money today. She commented that she couldn't hear the radio on, and said she wanted to split the action. Some 15 minutes later she called again inquiring whether he had any losers, and again wanted to split the action.

None of the officers had a search warrant. Defendant denied that he had ever, at any time, taken a bet.

In seeking a reversal defendant contends: (1) that the testimony of the officers and the evidence they found in the apartment were inadmissible since there was no probable cause for the arrest; and (2) that the evidence was insufficient

to support the judgment. We find no merit in either of these contentions.

Defendant argues that there was no probable cause for his arrest since the reliability of the informant was not established, and that his motion to strike the testimony of the officers and suppress the evidence should have been granted since Sergeant Cohen refused to give the source of his information with respect to the address and telephone number of defendant's activities. He also argues that the officers could have obtained a search warrant since there was no pressing emergency for the arrest.

In *People* v. *McShann,* 50 Cal.2d 802 [330 P.2d 33], the court stated (p. 808) : ''A mere informer has a limited role. 'When such a person is truly an informant he simply points the finger of suspicion toward a person who has violated the law. He puts the wheels in motion which cause the defendant to be suspected and perhaps arrested, but he plays no part in the criminal act with which the defendant is later charged.' (Citation.) His identity is ordinarily not necessary to the defendant's case, and the privilege against disclosure properly applies. When it appears from the evidence, however, that the informer is also a material witness on the issue of guilt, his identity is relevant and may be helpful to the defendant. Nondisclosure would deprive him of a fair trial. Thus, when it appears from the evidence that the informer is a material witness on the issue of guilt and the accused seeks disclosure on cross-examination, the People must either disclose his identity or incur a dismissal.'' The information in the instant case furnished by the informant merely served to point the finger of suspicion at the defendant. Following the lead thus provided, the officers went to the apartment house and while one of them kept the premises under observation the other telephoned the occupant of the apartment and placed a bet with him. Probable cause for defendant's arrest was provided by the information thus obtained through the officers' own investigation. The same type of investigation was made by the officers in *People* v. *Sakelaris,* 154 Cal.App.2d 244 [315 P.2d 902]. In that case it was stated (p. 248) : ''When police officers have information that a place is occupied by a person suspected of bookmaking, a felony, telephone the occupant of that place, and place a bet with him, they have probable cause to break down the door, enter, and arrest the suspect. (Citation.) '' To the same effect are *People* v. *Miller,* 143 Cal.App.2d 558, 560-561 [299 P.2d 1010],

and *People* v. *Hudak,* 149 Cal.App.2d 88, 92 [307 P.2d 942].
 As pointed out in *People* v. *Castro,* 176 Cal.App.2d 325, 327-328 [1 Cal.Rptr. 231] : ''The reliability of the informant is not an issue where there is probable cause for the arrest apart from the information supplied by the informant. (Citation.)'' In the present case the informant played no part in the criminal act. He was not a material witness on the issue of guilt. He was not present when defendant was arrested. His identity was not relevant. Therefore, nondisclosure did not deprive defendant of a fair trial. Consequently, the court properly denied defendant's motion to strike the testimony of the officers and to suppress the evidence.

Defendant's reliance on *People* v. *Durazo,* 52 Cal.2d 354 [340 P.2d 594], and *People* v. *Melody,* 164 Cal.App.2d 728 [331 P.2d 72] is misplaced. In the former case the informant actually participated in one of the sales of the narcotics. There is no comparable situation in the instant case. In the Melody case, the court held that the testimony of the informant would not be material and therefore disclosure was not required.

 Since the officers had reasonable cause to believe that a felony was being committed, it was unnecessary for them to obtain a search warrant.

In support of defendant's contention that the evidence is insufficient to justify the judgment he makes two arguments: (1) That in the conversation between Officer Bovensiep and defendant there is no evidence that the bet was accepted by defendant; and (2) there is no expert testimony to indicate what was meant by the conversation between the officer and defendant. With respect to the first argument, Officer Bovensiep inquired whether he was ''too late for the fourth.'' Defendant replied, ''No, you've got plenty of time.'' From this testimony the court could reasonably infer an implied invitation to Bovensiep to place a bet in the fourth race. Further, as Bovensiep was calling in his bet, defendant stated to him: ''Slow up, you're going—slow up, I can't write that fast.'' From this testimony the trial court could reasonably infer that defendant was writing down the bet at that time and therefore was accepting and recording it.

Defendant never denied having a conversation with the officer and never denied that he was the person on the telephone. He simply gave a different version of the conversation. The trial court, however, impliedly found in favor of

the officer's version. This implied finding is conclusive on appeal.

The meaning of the language used by the officer in placing his bet with defendant was of such common knowledge that it needs no expert interpretation. The statement of the court in *People* v. *Overman,* 149 Cal.App.2d 125 [307 P.2d 1000], is here apposite. The court stated (pp. 131-132): "It does not appear to us that any explanation of the purport of the telephone talks was required. Almost anyone of adult years, who is even casually acquainted with what goes on in the so-called 'sport of kings' at the various race tracks in Southern California and elsewhere would understand what was meant by what was said in the various telephone conversations. With all of the divers advertisements concerning the horse races at the several race tracks, the repeated radio announcements of the results and televising of the different races at least once each week, and with all of the propaganda about how many millions of dollars are given to charity by the race track owners, and all of the news stories of the frailties of the human beings who engage in embezzling money to 'play the horses,' it would be difficult to avoid coming into contact with, and having an understanding of the incidence of the race tracks and what the words meant." (See also *People* v. *Larum,* 111 Cal.App.2d 732, 734 [245 P.2d 323].)

It is common knowledge that horse races are conducted at Tanforan. Horses named "My Bond," "Broker's Reward," and "Tonco" were scheduled to run at Tanforan that day. In addition, there are other circumstances which support the trial court's implied findings: (1) The officers found the racing section of a newspaper under the cushions of the sofa; (2) the officers found, in defendant's apartment, a racing parlay manual; (3) while in defendant's apartment, the officers answered a telephone call from a person who made inquiries in a bookmaker's vernacular; (4) when Officer Riegel entered defendant's apartment the latter was standing by the garbage disposal unit which was running.

The trial court would have been justified in concluding that defendant concealed the racing section of the newspaper under the sofa cushions, and that he had destroyed his notations of Bovensiep's bets in the garbage disposal. The telephone calls which the officers answered in defendant's apartment justified an inference that the premises were being occupied for the purpose of bookmaking. (*People* v. *Warnick,*

86 Cal.App.2d 900, 903 [195 P.2d 552].) This would tend to substantiate Officer Bovensiep's testimony that defendant had accepted a bet from him. The evidence is clearly sufficient to support the judgment of conviction.

The judgment and order are affirmed.

Ashburn, J., and Herndon, J., concurred.