[Crim. No. 5699. Fourth Dist., Div. Two. Apr. 16, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD ALEXANDER HAMBARIAN, Defendant and Appellant.

## COUNSEL

Keith C. Monroe and George H. Chula for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Mark L. Christiansen and Michael S. Klein, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KAUFMAN, J.**—Defendant appeals from a judgment of conviction of various violations of the Health and Safety Code relating to narcotics and dangerous restricted drugs.

Defendant was charged in an indictment with six counts, all arising out of alleged conduct on December 15, 1971: count I, manufacturing LSD (Health & Saf. Code, § 11912); count II, possession of LSD for sale (Health & Saf. Code, § 11911); count III, possession of marijuana for sale (Health & Saf. Code, § 11530.5); count IV, possession of mescaline for sale (Health & Saf. Code, § 11500.5); count V, maintaining a place for sale of narcotics (Health & Saf. Code, § 11557); and count VI, conspiracy to commit the other offenses (Pen. Code, § 182, subd. 1). By an amendment to the indictment, it was charged that defendant had suffered a prior conviction of a violation of Health and Safety Code section 11530 (possession of marijuana), which defendant admitted.

The case was tried to a jury. During the trial, counts I (manufacturing LSD) and VI (conspiracy) were dismissed on motion of the prosecution. The jury found defendant guilty of counts II (possession of LSD for sale), III (possession of marijuana for sale), and IV (possession of mescaline for sale). As to count V (maintaining a place for sale of narcotics), the jury found defendant guilty of two necessarily included offenses, possession of paraphernalia for smoking a narcotic (Health & Saf. Code, § 11555) and knowingly being in a place where narcotics are being unlawfully used (Health & Saf. Code, § 11556).

At sentencing, the admitted prior conviction was stricken, defendant was sentenced to state prison for the term prescribed by law on the conviction of count II (possession of LSD for sale), and sentence was suspended as to the other convictions pending service of the sentence imposed with respect to count II.

### Preliminary Fact Statement

It was the theory of the prosecution that defendant, using his own name Donald Hambarian and an alias, David Talbert, was engaging in the charged unlawful conduct primarily at a residence at 1183 Miramar Street, Laguna Beach. Quite correctly, defendant does not challenge the sufficiency of the evidence to support his convictions, for the evidence of his guilt can only be characterized as overwhelming. Substantial quantities of narcotics, dangerous drugs and paraphernalia were found in numerous locations throughout the residence; defendant alone was found present at the resi-

dence; personal effects belonging to defendant were found scattered throughout the residence; and his occupancy of the premises, at least as a cotenant, was established by at least two disinterested witnesses. Nevertheless, a statement of some of the pertinent facts is necessary at this point to understand the contentions made by defendant and our disposition thereof. Further facts, most of them procedural, will be set forth hereinafter in connection with the contentions to which they pertain.

At about 2 a.m. on December 15, 1971, at the Laguna Beach police station, Agent Michael Barnes of the Bureau of Narcotics Enforcement obtained a search warrant for the premises at 1183 Miramar Street, Laguna Beach, a residence structure consisting of three levels, the lowest level being a cellar or at least having a dirt floor. At about 4 a.m. that same morning, Agent Barnes, in the company of other law enforcement personnel, executed the warrant. They approached the front door of the house and twice knocked and loudly announced their identity, their possession of a search warrant and their intention of serving the warrant. They heard some noise inside the residence, but no one came to the door, and after waiting a moment or two, they opened the unlocked front door and entered. The only person found in the premises was defendant, who appeared to be asleep, in an alcove near the kitchen. A light was on in the kitchen. Agent Barnes looked into the kitchen, saw marijuana in ash trays and ice trays on the kitchen table and placed defendant under arrest. Within the house were found numerous documents bearing the names Talbert or Hambarian. A wallet was found containing a receipt bearing the name David Talbert and the address 1183 Miramar. In the same wallet there was a California driver's license in the name of Donald Hambarian. Also found was a receipt from an automobile repair agency made out to David Talbert. In one of the kitchen cabinets there were found a temporary driver's license and a receipt for the same in the name of defendant. In a closet on the lower level of the house were found photographs of defendant with other persons. In an overhead cabinet in the kitchen was found a glass flask with oily substance in it later determined to be hashish oil. In the storage area below the house in an ammunition box there were found nine plastic baggies containing numerous pills later determined to be LSD. Within a plaid canvas bag in a hall closet there were found white plastic bags containing what appeared to be marijuana and numerous bottles containing various colored powders appearing to be restricted dangerous drugs. It was later determined that these containers did in fact contain mescaline sulfate, DMT and LSD. Also found within the plaid canvas bag was material later determined to be hashish. Found buried beneath the house (in the ground floor of the lower level) was a plastic bottle con-

taining approximately $7,799 in currency. Also found in various places in the house were sizable quantities of ethyl alcohol (commonly used as a solvent to extract the active ingredient from hashish into hashish oil), a scale of a type commonly associated with the measurement and sale of narcotics and numerous vessels and smoking pipes of various sizes and descriptions containing residue of marijuana or hashish.

Mr. Redick was a real estate broker who negotiated the rental of the premises at 1183 Miramar Street in the spring of 1971 with a man named James Cowie. The rental agreement indicated that the premises were to be occupied by Cowie, Cowie's wife and another adult person. Mr. Redick saw Cowie early in May 1971 but did not see him thereafter.

Jo Ann Redick, the wife of the aforementioned Mr. Redick, was also a real estate broker in business with her husband in Laguna Beach. She received a number of communications from the owner of the premises at 1183 Miramar Street, Reverend Merwin, expressing some concern about the property. As a result of these communications, she went to the residence on a number of occasions. The first occasion was in early August 1971. She was greeted by defendant. She asked defendant if Mr. Cowie was there, and defendant said Mr. Cowie was in Hawaii but that he, defendant, was the third person on the rental agreement. Defendant paid her the rent and promised to keep up the premises. In October 1971, Mrs. Redick again went to the house where she had a conversation with defendant. Defendant stated that his name was David Talbert; that Mr. Cowie was no longer there; that he and another person named "Cappie" "were now in the property" and, again, that he was the third person on the rental agreement. "Cappie" was also present on this occasion. Just before Thanksgiving, in November 1971, Mrs. Redick again went to the house, saw defendant and had a conversation with him. Mrs. Redick told defendant that Reverend Merwin was worried about the condition of the house and wanted to make a physical inspection. Defendant gave her a telephone number and said he and the other residents would be more than happy to show the owner through. Although defendant's hair was somewhat shorter at the time of trial than when she had previously seen him, Mrs. Redick was positive that defendant was the same person she met and talked to at the house in August, October and November 1971 who identified himself as David Talbert.

Reverend Merwin, having been unable to communicate with Mr. Cowie and having been supplied by Mrs. Redick with the telephone number furnished by defendant, telephoned that number and asked for Dave Talbert. The person to whom he spoke on the telephone made an appointment

for Reverend Merwin to inspect the property. Reverend Merwin then went to the property and was shown through by defendant, who indicated that he was the person to whom the Reverend had spoken on the phone.

Mr. Grimm was the service manager for a Datsun dealer in Laguna Beach in 1971. He had dealings with defendant and worked on his car in August, October and November or December 1971. On each occasion, defendant represented himself to be David Talbert and gave his address as 1183 Miramar, Laguna Beach.

The defense was that on the morning defendant was found and arrested at the residence at 1183 Miramar, he was not a cotenant or regular occupant of the premises but, rather, a casual visitor. Defendant, however, did not testify at trial. The only significant evidence presented by the defense in support of this theory was the testimony of Dennis Soiffer, a friend of defendant. Mr. Soiffer testified that on the evening of December 14, 1971, defendant came to Mr. Soiffer's residence at 989 Miramar Street, Laguna Beach and that Mr. Soiffer, his girlfriend Debra Hogan and defendant went in defendant's automobile to see a motion picture in Hollywood. They returned to Laguna Beach sometime after 2 a.m. on December 15. Upon returning to Laguna Beach, Mr. Soiffer invited defendant to sleep at his residence, but defendant said "[h]e was going to check and see if he could sleep at the other house up the street, if anybody was there to let him in." Mr. Soiffer knew that defendant was living in the house at 1183 Miramar in about August 1971, but he did not know where he was living thereafter, nor did he know where he was living on December 15, 1971. Indeed, he did not know from where defendant had come just prior to picking him up to go to the movies. Mr. Soiffer had never known defendant to use the name David Talbert.

Debra Hogan also testified for the defense, verifying that she, Soiffer and defendant had attended a motion picture in Hollywood on the night of December 14, 1971, and that they had not returned to Laguna Beach until after 2 a.m. on the 15th.

### Contentions and Issues

As previously noted, defendant does not challenge the sufficiency of the evidence. Although in the trial court the defense did assert invalidity of the search warrant on *Aguilar-Spinelli* grounds (see *Skelton* v. *Superior Court,* 1 Cal.3d 144, 152-154 [81 Cal.Rptr. 613, 460 P.2d 485]), these arguments are not pursued on appeal. Rather, on appeal, defendant contends that the search warrant was invalid under the principles announced in *Theodor* v.

*Superior Court,* 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234][1] and that the denials of his several motions for discovery of the identity of a confidential informer deprived him of a fair trial.

### Controverting the Facts Upon Which the Search Warrant Was Issued—Discovery of Informer's Identity

The search warrant was issued on the basis of the sworn testimony of Agent Barnes and a confidential informer, tape recorded, transcribed and certified in accordance with Penal Code, section 1526, subdivision (b). Defendant moved in superior court to suppress all evidence resulting from the execution of the search warrant. (Pen. Code, § 1538.5, subd. (i).) In the suppression hearing before Judge Turner, defendant's principal efforts were directed at attempting to controvert the facts set forth in the certified transcript (see *Theodor* v. *Superior Court, supra,* 8 Cal.3d at pp. 90-101) and, for this purpose, defendant moved several times for discovery of the identity of the confidential informer. The prosecution asserted the privilege of nondisclosure provided for in Evidence Code section 1041. As to each such motion the trial court ruled that defendant was not entitled to discovery of the informer's identity for purposes of controverting the facts contained in the certified transcript and, at the conclusion of the hearing, indicated that defendant had utterly failed to show said facts were inaccurate or false. Accordingly, he denied defendant's motions for discovery of the informer's identity for this purpose and denied the motion to suppress. The court's rulings and actions in this respect were entirely correct, and Judge Turner is to be commended for correctly anticipating the principles of the decision in *Theodor.* (See fn. 1, *ante.*)

"[W]here a search is made pursuant to a warrant valid on its face, the public entity bringing a criminal proceeding is not required to reveal to the defendant . . . the identity of an informer in order to establish the legality of the search or the admissibility of any evidence obtained as a result of it." (Evid. Code, § 1042, subd. (b).) Although the court in *Theodor* did require disclosure of the identity of the confidential informer

---

[1]The relevant proceedings in the court below were had from March to June 1972. At that time, hearing in the *Theodor* case had been granted by the Supreme Court but its decision and original opinion in *Theodor* as reported in the official advance sheets at 8 Cal.3d 77 et seq. was not filed until September 28, 1972. The original opinion was subsequently modified on denial of rehearing on November 16, 1972. The modification is contained in the official advance sheets at pages 348a through 348c. Insofar as we can see, the modification will not require any change in pagination in the opinion when it is finally reported and, therefore, in citing the *Theodor* case we shall utilize the pagination of the original opinion (8 Cal.3d 77 et seq.). All references to the *Theodor* decision and opinion, however, are to the decision and opinion as modified.

in that case, it did so because it concluded the defendant had made a sufficient showing in connection with his motion at the preliminary hearing that the informer was a material witness on the question of guilt or innocence. (8 Cal.3d at pp. 88-90.) It did not purport to mandate, contrary to Evidence Code section 1042, subdivision (b), the disclosure of the identity of a confidential informer for the purpose of controverting the facts upon which a search warrant was issued. On the contrary, it stated: "It is well settled that California does not require disclosure of the identity of an informant who has supplied probable cause for the issuance of a search warrant where disclosure is sought merely to aid in attacking probable cause. (*People* v. *Keener* (1961), 55 Cal.2d 714, 723 [12 Cal.Rptr. 859, 361 P.2d 587]; see also *McCray* v. *Illinois* (1967) 386 U.S. 300 [18 L.Ed.2d 62, 87 S.Ct. 1056].)" (8 Cal.3d at p. 88.)

Defendant contends that he met his "initial burden of demonstrating the inaccuracy or falsity of" the facts set forth in the certified transcript (*Theodor* v. *Superior Court, supra,* 8 Cal.3d at pp. 101-102) and that, thereupon, the burden shifted to the prosecution to establish that the inaccuracies or false statements were made or included as the result of reasonable misapprehensions or were reasonably relied upon (*Theodor* v. *Superior Court, supra,* 8 Cal.3d at p. 102.) We deal with these contentions at greater length hereinafter, but we here note that defendant implies that, assuming the accuracy of these contentions, disclosure of the informer's identity would be required. If this implication constitutes an argument, we reject it.

It is correct that, under the *Theodor* decision, if the defendant has carried his initial burden of demonstrating the inaccuracy or falsity of pertinent facts upon which the search warrant was issued, the burden of proving that they were made as a result of reasonable misapprehension or were otherwise reasonably relied upon shifts to the prosecution. But the prosecution is not thereby necessarily required to disclose the identity of the confidential informer. It may meet its burden of proof by any competent evidence it chooses to present and, indeed, even if it should fail to meet its burden of proof, the result is not an automatic invalidation of the search warrant. The result is, under such circumstances, that the inaccurate or false statements are excised, and the existence or nonexistence of probable cause for issuance of the warrant is determined from the remaining truthful and accurate information. (*Theodor* v. *Superior Court, supra,* 8 Cal.3d at pp. 95-101, particularly at pp. 100-101; *People* v. *Buchanan,* 26 Cal.App.3d 274, 286 [103 Cal.Rptr. 66].)

Before proceeding to review defendant's claim that he met his initial burden of demonstrating the existence of inaccurate or false statements in

the certified transcript, we think it appropriate to point out the requirement laid down in *Theodor* that "[b]efore a hearing is required to test the veracity of an affidavit, the defense must relate, with some specificity, its reasons for contending that the affidavit is inaccurate." (8 Cal.3d at p. 103.) At the commencement of the suppression hearing, the defense asserted, in substance, only that the circumstances under which the informer apparently gave his information appeared suspicious and that the defense wished to inquire into those circumstances to ascertain whether the informer was coerced by the police into supplying information. It was also indicated early in the suppression hearing that the defense might call a witness other than Agent Barnes to testify, but neither the identity of the proposed witness nor the subject of his testimony was disclosed. We have considerable doubt whether this showing was sufficient to entitle defendant to a contravention hearing under the above quoted standard of *Theodor*. Nevertheless, this issue is not critical in this case, because the prosecution stipulated that defendant might question Agent Barnes in an attempt to controvert the facts contained in the certified transcript and made no objection to defendant's subsequently taking the stand to testify for that purpose.

To review defendant's claim that he met his burden in demonstrating the inaccuracy or falsity of the pertinent facts contained in the certified transcript and to deal with defendant's other contention that the informer was a material witness on the question of guilt or innocence, it is necessary to refer to some of the facts contained in the certified transcript supporting the warrant and some of the testimony adduced at the suppression hearing. It is unnecessary, however, to detail either fully, and we shall attempt to limit our summary to those portions of the certified transcript and the suppression hearing testimony pertinent to these issues.

The sworn testimony of Agent Barnes and the informer was adduced through the questioning of the magistrate and a deputy district attorney at 1:50 a.m. on the morning of December 15, 1971, at the Laguna Beach police department. Agent Barnes testified first. The heart of his testimony was that on December 14 and 15, 1971, he personally spoke with the confidential informer who related to him that on Saturday, December 11, 1971, the informer was in a bedroom of a residence located at 1183 Miramar Street, Laguna Beach; that while he was in this bedroom, the informer observed several objects that the informer knew, from his previous frequent experience in smoking hashish and from his actually smoking a portion of the objects described on this occasion, to be hashish; that the informer approximated the amount of hashish he saw on this occasion to be six or more pounds; that the informer also observed in the bedroom on this

occasion a large amount of United States currency estimated by the informer to be between $10,000 and $30,000; that the informer was admitted into the residence by a person known to him as Mr. Don, described as a white, male adult approximately 21 to 22 years old, approximately 5 feet 8 inches in height, weighing approximately 160 pounds and having a dark complexion and long, shoulder-length, bushy and curly hair as well as a mustache; that this person resides at the 1183 Miramar Street residence; that the informer had seen this person there on prior occasions; that this person had exercised dominion and control over the residence; and that the informer had said that Mr. Don had displayed documents which identified Mr. Don as David Talbert; and that this document was a driver's license in the name of David Talbert.

Next, the informer testified. The heart of his testimony was that during the 30 days preceding December 15, 1971, he had been in the residence at 1183 Miramar Street on two or three occasions and observed at different times quantities of hashish and large quantities of money; his most recent visit to the residence was on December 11, 1971, on which occasion he observed six or seven large packages of hashish weighing approximately seven pounds on the floor and a stack of money that was about as thick as a normal bible; that he was thoroughly familiar with hashish because he himself had smoked hashish several thousand times and had smoked some of "this particular stuff." When questioned about the individual who had admitted him into the residence, the informer testified it was a person named Mr. Don; that he thought Mr. Don's alias might be Mr. Talbert; that he thought his first name was David, although he was not positive about that. He described Mr. Don as about 5 feet 8 inches or 5 feet 9 inches in height, 150 pounds in weight and having dark hair and a dark complexion. The informer was asked: "Have you seen any documents relating to Mr. Don or Mr. Talbert *inside of his house?*" (Italics supplied.) The informer answered: "No." He testified, however, that Mr. Don did one time tell him his name was David Talbert.[2]

---

[2]Although no argument with respect thereto is contained in defendant's brief on appeal, it is indicated that the informer's testimony that he had not seen any documents relating to Mr. Don or Mr. Talbert was inconsistent with Agent Barnes' testimony that the informer had told him that he had seen such documents, specifically a driver's license. Inasmuch as the testimony of the informer that he had seen no such documents was limited by place, to wit, "inside of his house," there is no irreconcilable inconsistency with Agent Barnes' testimony which was not so limited. In any event, however, we do not think that the existence of such a minor possible inconsistency is what the court in *Theodor* had in mind in discussing inaccuracies or falsehoods. In this connection, we note two things. First, insofar as the identity of Mr. Don and Mr. Talbert was involved, the informer did testify under oath that one time Mr. Don told him his name was David Talbert. Secondly, the application was for a search warrant of specified premises and, technically, the identity of Mr.

The attempt by the defense to demonstrate that the informer was coerced by the police into giving information was wholly unsuccessful. At the suppression hearing, Agent Barnes testified that he made personal arrangements to meet the informer at the police station and did meet him there at about 11 p.m. on December 14, 1971.[8] The informer did not arrive at the police station in a law enforcement vehicle, and Agent Barnes did not know if he departed in one. Shortly after Barnes' first conversation with the informer began, the informer told Barnes he was willing to cooperate with the police. Although, insofar as Agent Barnes knew, the informer was free to leave the police station, there was discussion between the informer, Barnes and several law enforcement agents for something in excess of two hours. Barnes testified that he indicated to the informer that the information Barnes had had led him to believe that the informer was involved in criminal activities, that he could possibly be charged at that time or some later time and that it would be in his best interests to assist in the investigation rather than be investigated. Barnes did not discuss with the informer any criminal charges against the informer's wife, girlfriend or family and did not discuss with him any possible sentences. The informer was told that information relating to his implication in criminal activity would be presented to the district attorney for evaluation. The informer was not present in the police station that night for investigation of criminal activity in which the informer had been involved. Agent Barnes did not feel the informer gave his testimony to clear himself. In the agent's opinion, the informer made the statements he did because he saw the possibility of some criminal prosecution or investigation against him and, in discussing the matter with Barnes and several other law enforcement agents, determined that it was possible at that time for him to assist himself. Barnes also testified that prior to the taped recording of the testimony, he had told the magistrate that the informer was under investigation and that the

---

Don and Mr. Talbert was not essential. The question before the magistrate was whether there was probable cause to believe that hashish was present in the place to be searched. (*Skelton* v. *Superior Court, supra,* 1 Cal.3d at p. 150; *Frazzini* v. *Superior Court,* 7 Cal.App.3d 1005, 1012-1013 [87 Cal.Rptr. 32].)

[8] How these arrangements were made and by whom is the subject of considerable confusion on the record before us. Agent Barnes testified that he personally made these arrangements and that they were not made through any other police or law enforcement agency. He was then asked: "You personally contacted the man and said, 'Meet me at the Police Department at 11:00 o'clock?'" Agent Barnes answered: "No, sir." Immediate clarification of the point was frustrated by an objection by the district attorney which was never ruled on and which deteriorated into an argument as to whether the identity of the informer should be disclosed, followed by the evening adjournment of court. When the proceeding resumed two days later, the particular point was not pursued further.

informer had been told he was suspected of crime and understood the possibility of prosecution.[4]

Many informers are themselves charged with or under investigation for criminal activity and give information to the police in the hope or expectation of receiving favorable treatment. (See *People* v. *Goliday,* 8 Cal.3d 771, 780-781 [106 Cal.Rptr. 113, 505 P.2d 537]; *People* v. *Cheatham,* 21 Cal.App.3d 675, 677, fn. 2 [98 Cal.Rptr. 670].) While such circumstances enhance the possibility of fabrication or exaggeration on the part of the informer and should alert both the police and magistrate to such possibility, they do not, certainly as a matter of law, render the information given by the informer unreliable or constitute coercion. (Cf. *Skelton* v. *Superior Court, supra,* 1 Cal.3d at pp. 153-154; *People* v. *Lyons,* 50 Cal.2d 245, 265 [324 P.2d 556].) The trial court determined the question of coercion adversely to defendant, expressly by its ruling that defendant had failed to show inaccuracy or falsity of the facts in the certified transcript and impliedly by its ruling denying the motion to suppress (*People* v. *West,* 3 Cal.3d 595, 602 [91 Cal.Rptr. 385, 477 P.2d 409]; *People* v. *Sanchez,* 24 Cal.App.3d 664, 685 [101 Cal.Rptr. 193]; cf. Evid. Code, § 402, subd. (c)). ▮ In hearing a motion to suppress under Penal Code, section 1538.5, subdivision (i), the superior court is the trier of fact (*People* v. *West, supra; People* v. *Sanchez, supra,* 24 Cal.App.3d at p. 684), and its determination will be sustained on appeal unless not supported by substantial evidence. (*People* v. *Harrington,* 2 Cal.3d 991, 997 [88 Cal.Rptr. 161, 471 P.2d 961]; *People* v. *Lee,* 3 Cal.App.3d 514, 525 [83 Cal.Rptr. 715];

[4]Although, again, no argument with respect to the point is made in defendant's appellate brief, it is there noted that, when he started questioning Agent Barnes about his training and experience in police narcotics work, the magistrate preceded the questioning with a statement which reads in part: "I have not met you until this recording has been started." At trial it was suggested that this statement was inconsistent with Agent Barnes' suppression hearing testimony that he had spoken to the magistrate a half hour or hour before the tape-recorded testimony was taken. The magistrate's statement may have simply been his way of stating that he was not previously acquainted with the qualifications of Agent Barnes. In any event, it is the testimony of witnesses, tape-recorded, transcribed and certified, that supports the issuance of the search warrant in lieu of an affidavit (Pen. Code, § 1526, subd. (b)), and the magistrate's statement was not testimony. Thus, no inconsistency exists. Agent Barnes did testify before the magistrate that he had personally questioned the informer as to his involvement in narcotics sales and activities in the Laguna Beach and Orange County areas and that the informer freely related to him activities in specific details that Agent Barnes knew to be true from his own prior investigations. Additionally, the informer related to the magistrate a number of facts concerning his smoking hashish and his recognition of hashish which indicated his involvement in narcotics traffic. Although the magistrate did not specifically inquire into the existence of present or the possibility of future criminal charges against the informer, it is obvious from a reading of the certified transcript that the magistrate was fully aware of these possibilities.

*People* v. *Sanchez, supra,* 24 Cal.App.3d at pp. 684-685.) █ The trial court's determination that the informer's testimony was not coerced is amply supported by the evidence in the case at bench. Indeed, aside from the speculations of the defense counsel, the record contains no evidence of coercion.

█ Insofar as controverting the facts supporting issuance of the warrant is concerned, defendant's principal argument appears to be that his own testimony at the suppression hearing demonstrated the untruthfulness of the informer's testimony that he was at the residence on December 11, 1971, and observed a large quantity of hashish and money there on that occasion. It is asserted that the court at the suppression hearing characterized defendant's testimony as candid, and it is implied that the court believed defendant's testimony. Although the court characterized a portion of defendant's testimony as candid, the question of his overall credibility was never reached because the court found no conflict between his testimony and that of the informer.

In a series of questions, defense counsel asked defendant whether, on the 11th of December 1971, there was in the bedroom of the residence at 1183 Miramar Street, Laguna Beach six or more pounds of hashish, between $10,000 and $30,000 in United States currency, six or seven large packages of hashish on the floor, or a stack of money an inch or two thick. To each question defendant responded: "No, not that I know of." Then, however, defendant testified that although he had been in the residence at 1183 Miramar one day during the weekend of December 11, 1971, he could not say for sure whether it was December 11 or December 12. "I couldn't pinpoint exactly whether I was there exactly on that date or not." At the conclusion of defendant's testimony, the court observed: "Mr. Hambarian has just candidly and honestly told the Court that he doesn't remember whether he was in the house on December 11. In looking through the affidavit as to both what the informant had told Officer Barnes and what the informant told the Court, he was talking about Saturday, December 11 specifically." The court then went on to point out that, inasmuch as defendant could not specifically remember being at the residence on December 11, his testimony did not controvert the testimony and information given by the informer relating specifically to December 11. These observations of the trial court were correct, and the trial court's determination that the facts set forth in the certified transcript had not been shown to be false or inaccurate is supported by the record and will not be overturned on appeal. (*People* v. *Harrington, supra,* 2 Cal.3d at p. 997; *People* v. *Lee, supra,* 3 Cal.App.3d at p. 525; *People* v. *Sanchez, supra,* 24 Cal.App.3d at pp. 684-685.)

*Discovery of Informer's Identity—Material Witness*

On March 23, 1972, during the suppression hearing, Judge Turner had denied one of defendant's several oral motions for discovery of the identity of the informer for the purpose of controverting the facts contained in the certified transcript. On March 24, 1972, defendant filed a written motion for discovery of the informer's identity based not only on the contravention theory but also on the theory that the informer constituted a material witness on the issue of guilt or innocence. In the points and authorities accompanying the motion, the material witness theory was stated as follows: "The evidence is in square conflict as to who, if anyone, the informant saw at the premises December 11. Since the charges in this case involve manufacturing [manufacturing LSD, count I], among others, it is essential to defendant's defense that he be able to show by examination of the informant that he was not the person in control of the premises on December 11." The court's minutes disclose that this motion was heard and denied by Judge McMillan on March 24. The record before us does not include a transcript of the argument on this motion.

The motion for discovery on the basis that the informer was a material witness on the issue of guilt or innocence was renewed at the commencement of trial. The theory advanced in support of the renewed motion was essentially the same as that set forth in the points and authorities supporting the written motion (material witness as to manufacturing LSD, count I) but was expanded. The expanded theory was that, since the informer had stated he was in the residence on December 11, 1971, and saw and talked to a person there on that date, he was a material witness as to guilt or innocence also with respect to the charges of conspiracy (count VI) and maintaining a place for sale of narcotics (count V). As to the charges of possession of LSD, marijuana and mescaline for sale (counts II, III and IV, respectively) it was urged that the informer's testimony might indicate that someone other than defendant was present on December 11 and that, therefore, his possession "was not exclusive." The renewed motion was likewise denied.

Defendant contends that his motions for discovery of the identity of the informer as a material witness should have been granted and that their denial resulted in depriving him of a fair trial. We are inclined to agree that viewed as of the time they were made, the motions for discovery should have been granted under existing case law. In view of the evidence at trial and the disposition of the several charges against defendant, however, *we do not agree that the denial of defendant's motions deprived him of a fair trial.*

■ "[W]hen the defendant makes an adequate showing that the informer may be a material witness on the issue of guilt or innocence, disclosure should be compelled or the case dismissed." (*Theodor* v. *Superior Court, supra,* 8 Cal.3d at p. 88 and cases there cited.) The showing required of a defendant seeking disclosure was delineated in *People* v. *Garcia,* 67 Cal.2d 830, 839-840 [64 Cal.Rptr. 110, 434 P.2d 366] and has been frequently repeated in the decisions of the California Supreme Court (e.g., *Theodor* v. *Superior Court, supra; Price* v. *Superior Court,* 1 Cal.3d 836, 843 [83 Cal.Rptr. 369, 463 P.2d 721]; *Honore* v. *Superior Court,* 70 Cal.2d 162, 168 [74 Cal.Rptr. 233, 449 P.2d 169]): "[A] defendant seeking to discover the identity of an informant bears the burden of demonstrating that, *'in view of the evidence,* [fn. omitted] the informer would be a material witness on the issue of guilt *and nondisclosure of his identity would deprive the defendant of a fair trial.'* [Citations omitted.] That burden is discharged, however, when defendant demonstrates a reasonable possibility that the anonymous informant whose identity is sought could give evidence on the issue of guilt *which might result in defendant's exoneration."* (Italics supplied.)

■ At the time defendant presented his motions in the trial court for disclosure of the identity of the informer on the basis that the informer constituted a material witness, defendant was charged not only with possession for sale of LSD, marijuana and mescaline (counts II, III and IV, respectively) but with manufacturing LSD (count I), maintaining a place for sale of narcotics (count V) and conspiracy to commit the other offenses (count VI). As we have previously indicated, the showing made by defendant in support of his written pretrial motion and his renewed motion at trial related almost exclusively to the last mentioned charges (counts I, V and VI). Although all of these charges were alleged in the indictment to have occurred on December 15, 1971, the identity of the person the informer saw and talked to in the premises on December 11, 1971, might well have been material to defendant's guilt or innocence of these charges, particularly the charge of conspiracy. Thus, we think defendant's showing was sufficient with respect to these counts and that under the controlling authorities disclosure should have been required as to these counts. (Cf. *Theodor* v. *Superior Court, supra,* 8 Cal.3d at pp. 89-90; *Honore* v. *Superior Court, supra,* 70 Cal.2d at pp. 168-170; *People* v. *Garcia, supra,* 67 Cal.2d at pp. 838-839.)

On the other hand, we think defendant's showing in support of disclosure as to the charges of possession for sale of LSD, marijuana and mescaline (counts II, III and IV, respectively) was insufficient. As previously indicated, there was no showing whatever as to these counts in

connection with the written pretrial motion, and, in support of the motion renewed at trial, it was asserted only that the informer might indicate that someone other than defendant was present on December 11 and that, therefore, defendant's possession "was not exclusive." Conviction, of course, need not be predicated upon exclusive possession, and a showing of nonexclusive possession would not exonerate defendant. (*People* v. *Redrick,* 55 Cal.2d 282, 288-289 [10 Cal.Rptr. 823, 359 P.2d 255]; *Frazzini* v. *Superior Court,* 7 Cal.App.3d 1005, 1013 [87 Cal.Rptr. 32]; *People* v. *McGlory,* 226 Cal.App.2d 762, 766 [38 Cal.Rptr. 373].) Thus, defendant's showing with respect to the charges of possession for sale was speculative and inadequate. (Cf. *People* v. *Goliday, supra,* 8 Cal.3d at pp. 775, 783-784; *People* v. *McCoy,* 13 Cal.App.3d 6, 12-13 [91 Cal.Rptr. 357].)

Irrespective of the original showing, the case is not before us on an application for a pretrial writ of mandate or prohibition (see *Theodor* v. *Superior Court, supra,* 8 Cal.3d at p. 83; *Price* v. *Superior Court, supra,* 1 Cal.3d at pp. 838-839; *Honore* v. *Superior Court, supra,* 70 Cal.2d at pp. 164-165), but, rather, on an appeal from a judgment of conviction following a full trial (see *People* v. *Goliday, supra,* 8 Cal.3d at p. 774; *People* v. *Garcia, supra,* 67 Cal.2d at p. 832; *People* v. *McShann,* 50 Cal.2d 802, 804 [330 P.2d 33]). The question before us, therefore, is not whether defendant will be deprived of a fair trial by nondisclosure of the identity of the informer but whether he has been deprived of a fair trial by such nondisclosure. (*People* v. *Goliday, supra,* 8 Cal.3d at p. 784; cf. *People* v. *Shipp,* 59 Cal.2d 845, 849 [31 Cal.Rptr. 457, 382 P.2d 577]; *People* v. *Archuleta,* 16 Cal.App.3d 295, 299-300 [93 Cal.Rptr. 881].) In resolving that question, we look not only at the pretrial proceedings (*People* v. *Garcia, supra,* 67 Cal.2d at p. 839, fn. 10) but also at the proceedings had and evidence adduced at trial. (See *People* v. *Goliday, supra,* 8 Cal.3d at pp. 783-784; *People* v. *Garcia, supra,* 67 Cal.2d at pp. 833-834; *People* v. *McShann, supra,* 50 Cal.2d at pp. 809-810; cf. *People* v. *Shipp, supra,* 59 Cal.2d at pp. 849-852; see also *People* v. *Archuleta, supra,* 16 Cal.App.3d at pp. 299-300.)

We deal first with the charges of manufacturing LSD (count I), maintaining a place for sale of narcotics (count V) and conspiracy (count VI) as to which, as we have previously indicated, defendant's initial showing was probably sufficient to require disclosure. Prior to submission of the case to the jury, counts I and VI were dismissed on motion of the prosecution, and the jury did not find defendant guilty of the charge of maintaining a place for sale of narcotics contained in count V. As to these counts,

therefore, it cannot be said that defendant was deprived of a fair trial by nondisclosure of the identity of the informer.

We deal next with the charges of possession for sale of LSD, marijuana and mescaline (counts II, III and IV, respectively) and the charges of possession of paraphernalia for smoking a narcotic (Health & Saf. Code, § 11555) and knowingly being in a place where narcotics are being unlawfully used (Health & Saf. Code, § 11556) of which defendant was found guilty as offenses necessarily included in the charge of maintaining a place for sale of narcotics (count V). Not only did defendant fail to make an adequate preliminary showing in support of his discovery motions that the informer was a material witness as to his guilt or innocence on counts II, III and IV, but the evidence adduced at trial establishes that the informer could not have given evidence that might have resulted in defendant's exoneration of those charges. The same is true with respect to the necessarily included offenses of which defendant was convicted. As to these five offenses, we find the case indistinguishable on any substantial basis from the possession for sale convictions affirmed in People v. Goliday, supra, 8 Cal.3d at pp. 775, 783-784.

Defendant's guilt of these offenses on December 15, 1971, was established by overwhelming evidence without reference to anything the informer might have witnessed or said. As hereinabove set forth in the preliminary fact statement, large quantities of narcotics, dangerous drugs and paraphernalia were found in numerous locations throughout the residence; defendant alone was found present at the residence; personal effects belonging to defendant were found scattered throughout the residence; and his occupancy of the premises, at least as a cotenant, was established by at least two disinterested witnesses. There is no indication whatever that the informer could have "planted" the contraband found throughout the residence, and the defense offered no explanation for the presence of the contraband, nor, indeed, any credible explanation of defendant's presence in the residence at the time the search warrant was executed.[5]

Had the informer been disclosed and called as a witness by defendant, he could have at most testified to the events he perceived on December 11, 1971, four days before the date of the commission of the offenses of

---

[5] In view of the positive and uncontroverted testimony of Mrs. Redick and Reverend Merwin concerning defendant's occupation and control of the residence, the feeble attempt on the part of the defense to imply from the testimony of Mr. Soiffer that defendant was only a casual overnight visitor must be characterized as insubstantial if not incredible.

which defendant was convicted.[6] Such testimony would conceivably be remotely material to the issues of defendant's knowledge and control of the contraband and paraphernalia found in the premises on December 15. It appears, however, that in *Goliday* there was also the possibility of such remotely material testimony by the undisclosed informers. Only five minutes before the officers' entry and arrest of the defendant in *Goliday,* both informers had been inside the premises in which there were present besides defendant four other persons and were percipient witnesses to the alleged sales transaction between defendant and a police officer. Obviously, what the informers saw concerning the sales transaction only five minutes earlier was more material to the elements of possession and control by the defendant in that case than the informer's observations in this case. The court nevertheless held in *Goliday* that the failure to disclose the identity of the informers in that case did not require reversal of the con- victions of possession for sale. (8 Cal.3d at pp. 783-784.) We cannot be sure whether the basis for the holding was that the informers were not material witnesses as to the issue of guilt or innocence on the possession for sale counts (see 8 Cal.3d at p. 783) or whether any testimony they might have given was so remotely material that, in view of the strong evidence of guilt, the defendant was not deprived of a fair trial as to the possession for sale counts by the absence of the informants (see 8 Cal.3d at p. 784). In view of *Theodor* v. *Superior Court, supra,* 8 Cal.3d at p. 88, *Price* v. *Superior Court, supra,* 1 Cal.3d at p. 843 and *Honore* v. *Superior Court, supra,* 70 Cal.2d at p. 168 (all writ cases), however, we think it likely that the last mentioned rationale constitutes the true basis for the affirmance in *Goliday* of the convictions of possession for sale.

In any event, we hold in the present case that defendant has not demonstrated, in view of the evidence including the evidence adduced at trial, a reasonable possibility that the informer could have given evidence on the issue of guilt that might have resulted in defendant's exoneration of the charges of which he was convicted (*People* v. *Garcia, supra,* 67 Cal.2d at pp. 839-840; *Theodor* v. *Superior Court, supra,* 8 Cal.3d at p. 88 and cases there cited) nor that nondisclosure of the informer's identity has

---

[6]By reference to certain hearsay declarations completely outside the record of the present appeal, defendant asserts that the informer was not at the premises on December 11, 1971, as he informed Agent Barnes and testified before the magistrate. We, of course, cannot consider matters outside the record on appeal, but we note that, if the assertion were true, the informer, so far as the record indicates, could not give any testimony at all pertinent to guilt or innocence.

deprived defendant of a fair trial. (*People* v. *Goliday, supra,* 8 Cal.3d at pp. 783-784; cf. *People* v. *Shipp, supra,* 59 Cal.2d at pp. 849-852.)

Affirmed.

Gardner, P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied on May 4, 1973, and the following opinion was then rendered:

**THE COURT.—** An appellate court may not on direct appeal from a judgment take judicial notice of or consider matters that were not considered by the trial court, especially hearsay declarations inadmissible in the trial court and not in existence at the time of trial. (*People* v. *Pearson,* 70 Cal.2d 218, 221-222, fn. 1 [74 Cal.Rptr. 281, 449 P.2d 217]; see also Evid. Code, § 459.)

Appellant's petition for a hearing by the Supreme Court was denied June 13, 1973.